IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| **IRINA BARRETT,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 1:13-cv-439 |
| | ) | TSE/JFA |
| **HILLEARY BOGLEY,** | ) | |
| Serve at:   4094 Whiting Road | ) | |
|               Middleburg, VA 20118 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **MIDDLEBURG HUMANE FOUNDATION,** | ) | |
| Serve at:   Hilleary Bogley, Registered Agent | ) | |
|               4094 Whiting Road | ) | |
|               Middleburg, VA 20118 | ) | |
| | ) | |
| Defendants. | ) | |

APR 1 0 2013

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## COMPLAINT

Comes Now Irina Barrett, and for her complaint against Hilleary Bogley and the

Middleburg Humane Foundation, states as follows:

### Introduction

1. This complaint brings before this court a claim under the Lanham Act, 15 U.S.C. § 1125

   and claims under Virginia law arising from actions of Hilleary Bogley and the

   Middleburg Humane Foundation in relation to dogs taken by those parties from Irina

   Barrett.

2. The Lanham Act provides, in pertinent part, that:

   Any person who, on or in connection with any goods or services, . . . uses in commerce
   any word, term, name, . . . or any combination thereof, or any . . . false or misleading
   description of fact, or false or misleading representation of fact, which -

1

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

## Parties

3. Irina Barrett ("Barrett") is a U.S. Citizen and a citizen of Russia, and is a resident of the County of Fauquier in the Commonwealth of Virginia.

4. Upon information and belief, Hilleary Bogley ("Bogley") is a resident of the County of Fauquier in the Commonwealth of Virginia.

5. Middleburg Humane Foundation ("MHF") is, upon information and belief, a Delaware Corporation with its main place of business and its headquarters in County of Fauquier in the Commonwealth of Virginia.

## Jurisdictions

6. This Court has jurisdiction over the federal claim brought in this action pursuant to 28 U.S.C. §§ 1331, 1338(a)-(b). The Court has jurisdiction over the state claims pursuant to 28 U.S.C § 1367.

7.  This is the proper venue to hear this case pursuant to 28 U.S.C. § 1391(a), as the defendants resides within Fauquier County, Virginia, which is within this district and division, and a substantial part of the events or omissions giving rise to the claim occurred in this district and division.

2

## Further Facts Concerning the Parties

8. Barrett is a professional canine breeder, and shows her animals nationally and internationally. She operates her profession and business from her residence, on a multi-building, five-acre lot in Broad Run, Virginia, which lot is zoned for agricultural purposes.

9. Prior to the events giving rise to this suit, Barrett had an excellent personal and business reputation.

10. Due to recent changes in the local practices and ordinances, Barrett is now required to obtain special permit approval from the Fauquier County Board of Zoning Appeals in order to acquire a kennel permit for the sake of operating her business. Accordingly, Barrett applied for a special permit for the operation of a kennel at her residence in Fauquier County, Special Permit #SPPT13-SC-011.

11. In her profession and business, Barrett engages in interstate commerce, including but not limited to the purchase of goods and services for the use of the business, in the sale of dogs to customers in other states, and in breeding dogs whose offspring are sold in other states.

12. In applying for the special permit, Barrett was furthering her commercial activity, including her interstate commercial activity.

13. In requiring a special permit for the operation of kennels, the Fauquier County Board of Zoning Appeals is affecting and regulating interstate commerce.

14. Bogley is or holds herself out as a humane investigator under Virginia Code § 3.2-6558 and -6559,[1] appointed by Fauquier County Circuit Court.

---

[1] § 3.2-6558. Humane investigators; qualifications; appointment; term.

15. Upon information and belief, MHF was incorporated in 1994 as a 501(c)3 nonprofit organization that takes in, advertises, and sells dogs, cats, horses, and other animals to individuals seeking the same, as well as providing related services. The sales are advertised as "adoptions," but fees are charged to the individuals receiving the animals as a precondition for receiving the animals.

---

A. A circuit court may reappoint any person as a humane investigator for any locality within its jurisdiction if the person:

    1. Was appointed as a humane investigator prior to July 1, 2003; and

    2. Has never been convicted of animal cruelty or neglect, any felony, or any crime of moral turpitude according to a criminal background check, which shall be performed by the attorney for the Commonwealth at the expense of the person seeking the appointment.

B. A circuit court may appoint a person to fill a vacancy in that jurisdiction created when a humane investigator who was appointed prior to July 1, 2003, is no longer willing or eligible to be a humane investigator, provided the person seeking appointment:

    1. Has received a written recommendation from the administrative entity that oversees animal control in the locality where the humane investigator seeks appointment;

    2. Has never been convicted of animal cruelty or neglect, any felony, or any crime of moral turpitude according to a criminal background check, which shall be performed by the attorney for the Commonwealth at the expense of the person seeking the appointment; and

    3. Has completed a basic animal control course approved by the State Veterinarian pursuant to § 3.2-6556.

C. A person residing outside the Commonwealth may be appointed as a humane investigator only if he is employed by a humane society located within the locality where he is seeking appointment.

D. Reappointments of humane investigators shall be for terms of three years. Each humane investigator shall, during each term for which he is appointed, complete 15 hours of training in animal care and protection approved for animal control officers. If a humane investigator is appointed to a succeeding term before or within 30 days after his current term expires, a criminal background check shall not be required. If a humane investigator's term expires and he is not appointed to a succeeding term before or within 30 days after his current term expires, the humane investigator shall not be appointed to another term.

§ 3.2-6559. Powers and duties of humane investigators.

A. Any humane investigator may, within the locality where he has been appointed, investigate violations of laws and ordinances regarding care and treatment of animals and disposal of dead animals.

B. Each humane investigator shall carry during the performance of his powers and duties under this chapter an identification card issued by the locality where the humane investigator is appointed. The identification card shall include the following information regarding the humane investigator:

    1. His full name;

    2. The locality where he has been appointed;

    3. The name of the circuit court that appointed him;

    4. The signature of the circuit court judge that appointed him;

    5. A photograph of his face; and

    6. The date of expiration of his appointment.

C. Each humane investigator shall record on a form approved by the administrative entity that oversees animal control every investigation he performs, maintain such record for five years, and make such record available upon request to any law-enforcement officer, animal control officer or State Veterinarian's representative. Each humane investigator shall file quarterly a report summarizing such records with the administrative agency that oversees animal control on an approved form. A humane investigator's appointment may be revoked as provided in § 3.2-6561 if he fails to file such report.

16. MHF finances its business operations through interstate commerce, including contributions and grants, the sale of animals and services, investment income, membership dues, fundraising events, and donations, with total revenue in 2011 of $647,066.

17. In 2011, MHF recorded $287,504 in revenue related to taking in and selling animals.

18. MHF, being a Deleware Corporation headquartered in Virginia, engages in interstate commerce. Additionally, upon information and belief, MHF is involved in interstate commerce through the purchase of goods and services for the use of the business, in the sale of dogs to customers in other states, and in providing services to dogs transported interstate, and in interstate solicitation of donations and money for state and interstate operations.

19. Bogley is the founder and president of MHF, and she is a paid agent, officer, and employee of MHF.

20. In 2011, MHF reported paying to Hilleary Bogley $65,912 in compensation, more than 250% of what MHF paid to any other employee.

**<u>Bogley's Investigation of Barrett</u>**

21. On or about January 12, 2013, Bogley went unannounced to the residence of Barrett, demanding entrance into the Barrett residence on Bogley's apparent authority as a humane investigator, alleging that she had received an anonymous report of animals in need.

22. On this date, Bogley used her apparent authority as a humane investigator to instruct Barrett that Barrett possessed too many animals for the residence and to pressure Barrett into relinquishing eight dogs to the MHF.

5

23. As a paid employee, agent, and fiduciary of MHF, Bogley's use of her office as a humane investigator to obtain the release or transfer of animals from Barrett to Bogley and/or MHF in the course of carrying out her official assignments constituted a Class 1 misdemeanor under Virginia Code § 3.2-6557(a).[2]

### Eight Dogs Relinquished

24. In connection with relinquishing the eight dogs to MHF, Bogley did not disclose that she is a paid employee/agent of MHF, who received nearly $66,000 as a salary from MHF in 2011. Instead she used her apparent authority from her Court-appointed position for the benefit of MHF and herself personally.

25. As an inducement to Barrett to surrender the eight dogs to MHF, Bogley promised that the dogs would be placed for adoption through MHF. Bogley did not disclose that MHF charges adoption fees for the animals they place, which convert "adoptions" into sales.

26. As an inducement to Barrett to surrender the eight dogs to MHF, Bogley promised that surrendering the dogs would not affect Barrett in any negative fashion and would in fact help Barrett in being approved for the special permit, which Barrett reasonable believed based on Bogley's representations and apparent authority as a humane investigator.

27. As an inducement to Barrett to surrender the eight dogs to MHF, Bogley promised that Barrett's name would not be disclosed by herself or MHF in connection with

---

[2] § 3.2-6557. Animal control officers and humane investigators; limitations; records; penalties.
A. No animal control officer, humane investigator, humane society or custodian of any pound or animal shelter shall: (i) obtain the release or transfer of an animal by the animal's owner to such animal control officer, humane investigator, humane society or custodian for personal gain; or (ii) give or sell or negotiate for the gift or sale to any individual, pet shop, dealer, or research facility of any animal that may come into his custody in the course of carrying out his official assignments. No animal control officer, humane investigator or custodian of any pound or animal shelter shall be granted a dealer's license. Violation of this subsection is a Class 1 misdemeanor. Nothing in this section shall preclude any animal control officer or humane investigator from lawfully impounding any animal pursuant to § 3.2-6569.

surrendering the animals, which Barrett reasonable believed based on Bogley's representations and apparent authority as a humane investigator.

28. As an inducement to Barrett to surrender the eight dogs to MHF, Bogley promised to assist Barrett in implementing various ideas of Bogley that Bogley considered to be necessary improvements to Barrett's residence, which Barrett reasonable believed based on Bogley's representations and apparent authority as a humane investigator.

29. Bogley did not issue any citations, summonses, or other legal documents to Barrett on her authority as a humane investigator as a result of the investigation. She also did not impound any animals.

30. Bogley returned to the Barrett's residence on or about January 13, 2013 to retrieve some of the dogs Barrett agreed to surrender, at which point Barrett showed various cleaning and other improvements made in the residence following Bogley's visit the day before.

### Three More Dogs Relinquished

31. On or about January 17, 2013, Bogley returned unannounced to Barrett's residence with Faquier County Deputy Reese, demanding entrance into Barrett's residence under the authority of the law. Bogley was also accompanied by another unknown individual, who entered the Barrett's residence without authority or permission.

32. On this date, Bogley used her apparent authority as a humane investigator to again pressure Barrett into relinquishing three dogs to the MHF.

33. As a paid employee, agent, and fiduciary of MHF, Bogley's use of her office as a humane investigator to obtain the release or transfer of animals from Barrett to Bogley and/or MHF in the course of carrying out her official assignments constituted a Class 1 misdemeanor under Virginia Code § 3.2-6557(a).

7

34. Upon information and belief, in order to induce Barrett to surrender additional dogs, Bogley knowingly misrepresented the condition of the initial eight dogs relinquished to the MHF.

35. In connection with relinquishing the three dogs to MHF, Bogley did not disclose that she is a paid employee/agent of MHF, who received nearly $66,000 as a salary from MHF in 2011, instead she used her apparent authority for the benefit of MHF and herself.

36. As an inducement to Barrett to surrender the three dogs to MHF, Bogley promised that the dogs would be placed for adoption through MHF. Bogley did not disclose that MHF charges adoption fees for the animals they place, which convert "adoptions" into sales.

37. As an inducement to Barrett to surrender the three dogs to MHF, Bogley promised that surrendering the dogs would not affect Barrett in any negative fashion and would in fact help Barrett in being approved for the special permit, which Barrett reasonable believed based on Bogley's representations and apparent authority as a humane investigator.

38. As an inducement to Barrett to surrender the three dogs to MHF, Bogley promised that Barrett's name would not be disclosed by herself or MHF in connection with surrendering the animals, which Barrett reasonable believed based on Bogley's representations and apparent authority as a humane investigator.

39. As an inducement to Barrett to surrender the three dogs to MHF, Bogley promised to assist Barrett in implementing various ideas of Bogley that Bogley considered to be necessary improvements to Barrett's residence, which Barrett reasonable believed based on Bogley's representations and apparent authority as a humane investigator.

### One More Dog Relinquished

40. Based on Bogley's prior representations, which Barrett reasonably believed, and Bogly's failure to disclose pertinent information, described above, on or about January 30, 2013, Barrett agreed to and surrendered to MHF another dog.

41. As a paid employee, agent, and fiduciary of MHF, Bogley's use of her office as a humane investigator to obtain the release or transfer of this animal from Barrett to Bogley and/or MHF in the course of carrying out her official assignments constituted a Class 1 misdemeanor under Virginia Code § 3.2-6557(a).

### Bogley's Report

42. Following the visits on January 12, 13, and 17, Bogley prepared and published to others a report of the visits.

43. Upon information and belief, this report was not published and/or drafted within the scope of Bogley authority as a humane investigator. In particular, upon information and belief, this report was not on the form prescribed for creating such reports, it was directed to parties without a similar interest or duty, it was not published for the purpose of furthering the investigation of violations of laws and ordinances regarding care and treatment of animals and disposal of dead animals but rather for the purpose of affecting the zoning board's decision concerning a business competitor of Bogley and MHF, and it was not directed first to the administrative entity overseeing animal control within the jurisdiction.

44. Bogely's report stated inter alia as follows:

9

a. "On January 11, 2013 I received an anonymous call of concern regarding dogs located at 6205 Beverleys Mill Rd. in Broad Run VA. The caller stated that there was a 'large number of dogs living in poor conditions'."

b. "I knocked on the front door and was greeted by Mrs. Irina Barrett. There was a strong urine/feces odor coming from inside of the house [...]"

c. "I asked why there were Boxer pups in with the Doberman puppies and she said that 2 litters had 'starved to death' since the mother did not produce milk so these puppies were the survivors and the Doberman mother was raising them. I explained that a responsible breeder would not allow puppies to 'starve to death' and would hand raise them. She said she just did not have the time to do that since she had so many dogs."

d. "As we were talking, I heard a dog whining behind a door and asked who was behind the door. Mrs. Barrett explained that was where she crated the house dogs so; she opened the door to a storage sized/walk in closet with no light on/no window, where a Doberman was in a crate. I explained that she cannot keep dogs inside of a dark closet, she let the Doberman out to run loose with the others.

e. "We then went outside and walked around the house to a room to the right of the garage where there were 2 – 6'X6' kennels. There was no ventilation in this room and again a strong stench of urine and feces filled the air. The walls were streaked in mud & feces. Both pens had urine soaked newspapers with a good amount of urine and feces. The dogs were unable to get out of their own waste."

f. "In the first pen there were 4 teenage Doberman puppies all that had dirty bandages on their ears from a current ear cropping surgery."

g. "Several of the Dane puppies looked underweight, acted fearful/un-socialized, and several had severe to moderate hair loss/lesions that appeared to be generalized demodectic mange."

h. "I also asked why none of the dogs had food or water bowls or access to water and she explained that they make too big of a mess when they are permitted to have water so she only allows then [sic] to drink 3-4 times a day when she offers water. No dogs have access to water unless she gives it to them."

i. "We then went to the back of the property to her 'kennel building'. When she opened the door, the stench of urine & feces was again very strong with no ventilation and very little natural light."

j. "There were a total of 17 dogs in this building: 1 Doberman in a small plastic airline carrier/crate […]"

k. "I asked why she had a male Great Dane with a female Doberman / was she cross breeding them? She said she just didn't have room to separate/house them."

l. "Across the center aisle, there were 2 more pens with: 3 Great Danes in the first 10' X 12' pen, and 3 Great Danes and a Doberman in last 10'X10' pen."

m. "There was also no ventilation in this building and the stench of ammonia and feces was very strong: our eyes were burning. The center isle had a cement trough that was 5-7 inches deep in fecal matter. It appeared that she shoveled fecal matter form [sic] the pens into the center trough."

n. "I explained that a majority of the dogs housed in this building did not have adequate space, the pens were too small/there was not adequate space, and that she must provide ventilation, water and light for these animals. I also expressed

11

concern over the 2 dogs being housed in small airline carriers. She said she lets them out 3-4 times a day. There was also no heat in the building."

o. "I did not serve her a compliance notice although I gave her many recommendations and pointed out the many areas that needed improvements: veterinary care for skin conditions, pressure sores on feet from dirty housing on hard surfaces with no bedding, rabies vaccinations (many are not current), improve cleanliness of kennels, provide ventilation in kennel areas, provide adequate space, dogs should not be housed in plastic crates and if they needed to be, they need more exercise as well as providing light for dogs housed inside during daylight hours. Mrs. Barrett was receptive and willing to make all of the needed changes. I explained that I would continue to work with her to help her make improvement in her kennels and daily care and strongly recommended that she consider reducing her numbers to provide a higher quality of care for her dogs [...]"

p. "Mrs. Barrett told me that she could not hire someone to help her with the kennels because 'the conditions were not good enough for someone to work in'. I expressed that if she felt the conditions were not god enough for someone to work in then how could they be good enough for the dogs to live in? She agreed with me."

q. "Mrs. Barrett had made several comments about that she had given away over 20 dogs in the past year on Craig's List to reduce her numbers and that she had several dogs there that she no longer wanted. I offered for her to relinquish dogs to the Middleburg Humane Foundation (MHF) ad explained that they would be

12

well care for: spayed neutered, receive all necessary medical care, behavioral care and then placed available for adoption. She relinquished a total of 8 dogs to MHF: 6 Great Danes, a German Shepherd and a Boxer."

r.   "After leaving the property, I spoke with Deputy Reese who had also been to this property and found out that Mrs. Barrett was not completely forthcoming with either of us in regards to what dogs she currently had. She had not shown me the 'sunroom' where she keeps a large number of Dobermans in plastic airline carriers as well as a Great Dane puppy she had in her laundry room therefore my total numbers from my first visit were incorrect. She had also not told Deputy Reese about the many different breeds at the property (Doberman Pinschers, Great Danes, French Bulldogs, Boxers & German Shepherds). I asked Deputy Reese to accompany me when I returned for a follow-up visit."

s.   "Deputy Reese and I returned to the property on Friday January 17, 2013 for a follow up visit. Mrs. Barrett's mother had just come from Russia and had imported/brought with another male Doberman Pinscher as well as the mother had super cleaned the inside of the house so there was a huge improvement in cleanliness of the basement area. She had also cleaned up the room to the side of the garage as well as removed the fecal matter from the kennel building but there was still no ventilation in either of these rooms, no light in the main kennel building, and some of the pens were all still overcrowded with giant breed dogs. There was still one Doberman in a plastic crate in the kennel building."

t.   "We entered the sunroom at the back of the house where she is housing 9 dogs: 8 Dobermans and 1 Boxer. The crates were reasonably clean but no one had access

13

to water and as she let them out one at a time for us to photograph, it was apparent that they loved getting out of their small crates. They all needed to urinate and really didn't want to go back in! She claims that she let out 3-4 times a day but I expressed concern that it would be very difficult for one person to let out so many individually crated dogs for proper daily exercise."

u. "I explained to Mrs. Barrett that we had a veterinarian, Dr. Roo Makosky, examine and do physical examinations on the 8 dogs previously released to MHF. There were multiple medical problems including: 2 Great Dane puppies had pneumonia, all 3 Dane puppies were coughing/kennel cough, one Great Dane adult had multiple bite wounds/scares all over her body with a very large "mass" on her ribcage that appears to be an encapsulated abscess, another Dane has very sore/swollen foot pads with pressure sores from being housed on dirty hard surfaces, all 3 Great Dane puppies have a severe case of demodectic mange (skin scrapped [sic] positive for mites), 3 dogs have ear infections, 3 dogs had an ocular discharge/eye infections, and fecal tests performed on 4 of the 8 dogs showed a moderate to heavy load of intestinal parasites: hookworms, whipworms and roundworms."

v. "On January 17th, Mrs. Barrett relinquished an additional 3 Great Danes to MHF."

w. "I visited her 3 separate websites and it appears that she had a very large number of puppies born in 2012. Her 3 websites are: zlatomira Kennels for her Great Danes. On this site she has 5 Great Dane litters listed that were born in 2012 with a total of 34 puppies. The website for her Boxers is: RGBG Kennel. This website listed 4 litters but the dates were unclear. Her other website is Canis- Maximus

<u>Kennels</u> for her Dobermans where she has 8 litters listed born in 2012 with a total of 61 Doberman puppies born. I was unable to find a website for her breeding of French Bull Dogs. She does breed this breed as she told me so and she has recently purchased the 2 younger Frenchies for breeding purposes. With just these 3 breeds: Dobermans, Great Danes & Boxers, she produced 99 puppies in 2012 It appears that she sells dogs locally as well as inter-state with many mentions of puppies being shipped out of state for a charge of $400. The web sites show a very large number of dogs being housed and produced over the past few years. With these numbers, this breeding facility can be classified as a puppy mill."

45. The foregoing report includes many factually false statements and gives rise to numerous factually false allegations, imputations, and insinuations, and give rise to many factually false inferences, as inter alia:

   a.   Upon information and belief, Bogley was not responding to an anonymous call of concern regarding dogs.

   b.   Upon information and belief, Bogley did not receive a complaint of a "large number of dogs living in poor conditions" at Barrett's residence.

   c.   There was not a strong urine and/or feces odor coming from the house at the time of Bogley's visit.

   d.   Barrett did not say that two litters had "starved to death," as no dogs starved to death at Barrett's residence.

   e.   Bogley did not explain that a responsible breeder would not have allowed puppies to "starve to death."

   f.   Barrett is a responsible breeder.

g.   Barrett did not say that she did not have the time to hand raise puppies.

h.   The "dark closet" described in the report is a spacious area with artificial light used by Barrett to allow dogs a chance for a nap for a few hours.

i.   The kennels described to the right of the garage were larger than six foot by six foot.

j.   There was no strong stench of urine or feces in the room to the right of the garage.

k.   The walls were not streaked in mud and feces, and any mud in the room was the result of the rainy conditions that day, which conditions were known to Bogley and not disclosed in her report.

l.   The pens in the room to the right of the garage did not have urine soaked newspapers or a significant amount of urine and feces.

m.   The dogs in the pens to the right of the garage were not unable to get out of their own waste.

n.   Any dirt on the bandages on the bandages of the Doberman puppies was not the result of inattention or lack of care, but rather the result of the veterinarian's instructions and the rainy conditions that day, which conditions were known to Bogley and not disclosed in her report.

o.   The Dane puppies were not underweight.

p.   The Dane puppies did not act fearful and/or unsocialized.

q.   Generalized demodectic mange is not indicative of a lack of attention to a puppy's medical needs.

r.   Barrett does not deprive her dogs of necessary food or water.

s.   There was no "very strong" "stench of urine & feces" in the "kennel building."

t.   The Doberman in the "kennel building" was not in a "small plastic airline carrier/crate." Additionally, Bogley was informed that the Doberman was being kept separate because of a recent surgery.

u.   Barrett did not state that the dogs were being kept together because there was no room to separate/house them.

v.   There was not three Great Danes and a Doberman in the last 10' by 10' pen.

w.   There was no "very strong" "stench of ammonia and feces."

x.   Barrett and Bogley's eyes were not burning.

y.   The trough in the center of the room was not five to seven inches deep in fecal matter.

z.   The majority of the dogs housed in the kennel building had adequate space.

aa.  Bogley did not offer a reasonable alternative to the bedding option used by Barrett.

bb.  Barrett did not state that she could not hire someone to help her with the kennel because "the conditions were not good enough to work in."

cc.  Barrett did not agree that the conditions were not good enough for her dogs to live in.

dd.  Barrett did not make comments about giving dogs away on Craig's List and has never used Craig's List for that purpose.

ee.  Barrett did not obscure the sunroom, but showed Bogley everything Bogley asked to see.

ff.   Barrett is not responsible if the numbers from Bogley's initial visit were not correct.

gg.   Barrett's mother had not "super cleaned" the inside of the house.

hh.   Barrett's practice of exercising the dogs and allowing them out of the crates is sufficient.

ii.   Upon information and belief, the medical condition of the dogs released to Bogley was not as Bogley described it.

jj.   Canis- Maximus Kennels did not list eight litters born in 2012.

kk.   Many of the litters listed were not listed as being bred by Barrett or being bred at her residence, and many of the litters listed were not bred by Barrett or bred at her residence.

ll.   Barrett told Bogley that Barrett does not breed Boxers, which information Bogley intentionally did not include in her report.

mm.   Barrett did not say that she breeds French bulldogs and does not breed French bulldogs.

46. Bogley's report also intentionally and negligently did not disclose pertinent facts related to this incident, thereby giving rise to false imputations and insinuations. These include:

a.   Bogley did not reveal her status as a paid employee/agent of MHF, who thereby indirectly benefits from the operations of MHF.

b.   Bogley did not reveal her status as the president and fiduciary of a competitor business.

c.   Bogley did not reveal that she is not a veterinarian.

d.  Bogley did not reveal that she had conflicting interests in performing her investigation and drafting her report, or the extent of those conflicting interests.

e.  Bogley did not reveal that Virginia Code § 3.2-6557(a) specifically prohibits her from using her authority of office to secure the transfer of animals for personal gain.

f.  Bogley did not reveal that many, if not all, of the medical problems actually discovered in the animals relinquished to MHF are not unusual in such animals, or were recessive genetic problems or birth defects, and are not a sign of negligent attention by their owners.

g.  Bogley did not reveal that Barrett purposefully relinquished to MHF the animals that were most in need of the veterinary support Bogley promised, and therefore were not representative of the conditions of the animals Barrett retained.

h.  Bogley did not reveal that most of the animals allegedly produced by Barrett in 2012 were not animals born or kept at the Barrett residence.

i.  Bogley did not reveal that she made a visit to the Barrett resident on or about January 13, 2013, and saw that Barrett had taken many of the steps Bogley had recommended to her.

j.  Bogley did not reveal the fact that she made the visit on January 13, 2013, as the details of that visit were unambiguously favorable to Barrett.

k.  Bogley did not reveal the factors, such as the raining or muddy weather, that contributed to the conditions she described in her report.

l.  Bogley did not reveal that Barrett's practice of allowing dogs access to water three to four times a day for thirty to forty minutes at a time was previously

approved by Deputy Fillippe of Fauquier Animal Control in connection with a 2011 inspection of Barrett's facilities.

m. Bogley did not reveals the fact that Barrett explained to Bogly the choice of bedding used and the past health and safety concerns to the dogs as a result of the use of other bedding options, including stomach obstructions.

n. Bogley did not reveals that she did not recommend to Barrett a better bedding option, despite Barrett's request.

o. Bogley did not reveal that she in fact praised Barrett's adoption scanning process.

p. Bogley failed to disclose that the Boxer dam is spayed, precluding her from breeding in the future.

47. Bogley also intentionally used words and expressions for the purpose of giving rise to false negative impressions, imputations and implications in the minds of readers, including, for instance, the term "puppy mill."

48. Bogley also intentionally drew factually false assumption and asserted unsupported and unsupportable opinions in drafting this report that went beyond the information known or knowable to her, while relying upon her authority as a humane investigator to cover these defects, including, for instance, concluding that the walls were "streaked in ... feces" and the pens had "urine soaked newspapers."

49. Bogley subsequently published the foregoing report to others, and all or part of the report was subsequently widely republished in whole or in part via email, social networking sites, the Internet, and newspaper, circulating locally, nationally, and internationally, including but not limited to, The Faquier Times-Democrat, Craigslist, and Facebook.

50. Upon information and belief, all or part of Bogley's report was read by inter alia Marsha
Wallace, Julie Michalenko, Cheryl D. Koren, Lachlan Leach, Kelly Adams, Beth Harris,
Abigail Wojtcki, Lisa Walters, Lacy Fowler, Katie Rediske, Jennifer Seifert, Christos
Papachristos, Liz Huffman, Victoria Gray, Sandy Clarke, Julie Marcus, Kim Snead,
Kelly Urf, Wendy D. Johnson, Diana Donofrio, J. Kochersperger, Peter Dyrohom,
Chanteal Craft, Joyce Gerhart, Susanna Marking, Lisa Carter, Suzanne Ashby, Susan
Werner Kramer, Glen Gee, Dr. Kristen Hitt, Nancy Sabo, Hayley Bartlett, Nancy
Richards, Jessica Smithberger, Naomi J. Girke, Marisa Bianchi, Jamie Sarzynski, Lacy
Ball, Patty Bradford, Theresa Desposito, Jenna Myhre, Elaine Nakash, Samantha
Hoffman, Janet S. Wheeler, Dr. Emily Chambers, Debbie Marson, Jamie Scoggin, Ellen
Mouri, Camille A. Bowman, Arianna Griffin, Annie Montessi, Robin Eddington, Kelly
Randall, Kristin Sparks, Anneen Farney, Marianne Bowen, Rachel Rule, Pamela M.
McCracken, Kathryn Tuttle, Ashley Stursa, Ross Taylor, Mike Cox, Ann Ingram, Ann
Courembis, Roxanne Rogers, Lauren Erickson, Joan Bastek, Cherry Tapley, Alanna
Dvorak, Corri Zid, Brenda G. Thompson, Mandy Shimshock, Ms. Randy Driegert,
Kathryn Robair, Nancy Lagasse, Melissa Fincham, Amy Graves, Annel Salinas,
Christopher Plummer, Becky Gregory, Debbie Lott, Ashley Rood, Bernita Oakes, Kathy
Durand, Richard Borza, Jen Petrie Vann, Jenny Sams, Jennifer Dodson, Kandra Anders,
Lori Miller, Carla Nammack, Sharon Jones, Katharine Dixon, Glenn Holtje, Christine
Duckwitz, Catherine Lubitz, Melinda Ondrus, Sheri Goncher, Katie McAree, Erika
Hooven, Chris T. Butler, Emily Morrell, Denise Reynolds, Heidi Davies, Nicolle Palmer,
Michelle Cox Hager, Wendy Schneider, Sharon Lupton, Leyla Oswald, Valerie Roop,
Brittany Cooper, Deb VanKleef, Charity Smith, Joshua Graves, Linda M Alejo, Thelma

Wright, Terese Dockery, Kim Carter, Jan Petit, Linda Klingensmith, Alla K McGeary,

Cynthia A. Smith, Andrea Cook, Gail Jordon, Kathy Hamdy, Marta Steane, Liz Martin,

Andre Surles, Wendy D. Williams, Eric T. Mizuno, Kathryn Diehl, Virginia McKinnon,

Jacqueline Cordoba, Angela Ricci, Stacy Kenneweg, Donna Von Herbulis, Jean Lowe,

Samantha Whetstone, Jan Anderson, Cheri McNealy, Karen Dalfrey, Julie Kearns, Chris

Rink, Angela Bennett, James Pinsky, Keith Lynn, Olivia Schlichting, Elizabeth Wilfong,

Patti Stinson, Shannon Russ, Brenda Eggleston, Christina Van Patten, Margaret

Lehmbert, Shellie Moubray, Martha Melott, Frances Czina, Nancy Roop, Gini Free,

Elyse Simpson, Kerri Crawford, Joyce Entremont, Helen Withrow, Janet Pence, Sherry

Moore, Els Delmotte, Lisa Alastanos, Jamie Koller, Shelby Scango, Mollie Morris,

Roberta Palsa, Kimberly Shepherd, Regina Voight, Vanessa Harris, Kelly Mason, Estelle

Dahl, Amy Cronin, Teri Roper, Rhonda E Clement, Kathy Lesser, Cassee Ger, Leslie

Solnick, John Polishuk, Tammy Adgate, Kathy Dalfrey, Sarah Irby-Goad, Patrick

Schweitzer, Mary Harper, Martha Clausen, Terri Armao, Beverley Derr, Jason Carey,

Kristen Ritrey, Mary Ellen Jacobi, Carol Nikov, Cynthia Klawon, Patience Sassone,

Deborah McClary, David G. Driegert, Jr., Pamela Sue Stilton, Jill Orlov, Emily Berg,

Jane Houser, Anita Puckett, Natalie Logsdon-Lowe, Manuela Entrekin, Elizabeth

Matyseck, Cara LeGrys, Melissa Palmer, Patti Stinson, Brad Johnson, Anne Richards,

Dawn Zartman, Brandy Knighting, Debra Fiore-Giovanelli, Dr. Rebecca Green Watson,

Kristin Dautrich, Christina Reinhard, Rebecca Kellert, Jill Ramsburg, Lori Reffett, Mary

Koralewski, Debbie Cattivera, Shelly Kochersperger, Puller Lanigan, Yvonne Fuller,

Carol Hummel, Thea Charrette, Caytlin J. Backe, Melissa A. Cain, Kelly Wayland,

Shayna Buie, Jamey Hale, Heidi DeGroat, Pam Jenkins, James Cobb, Melissa Bartlett,

Brenda Glasbrenner, Ginny Kelly, Allison E. Richardson, Anne Marie Hauer, Jane Sidney Oliver, Crystal Goetting, Karen Grinder, Laura Cotterman, Rhonda Hendricks, Vickie Waller, Jackie Felker, Coleen Pavlick, Andrea P. McCluskey, Diana Burket, Lori Sterne, Louise Cotulla, Darshni Mamania, Gerri Leen, P. Henry, Kathy Wilson, Tisha Sipe, Jim Carmalt, Rebecca Kuper, Rob Leinberger, Andrea Freeman, Corinne Thomas, Taylor Adams, Christine C. Bennett, Ragan Riley, Denise Durgin, Kathy Pridham, Pam Allen, Galadriel DiTomaso, Sarah Johnson, Sarah Johnson, Beth Presgraves, Stacey Patmore, Emily Fielder, Anne Marstiller, Stephanie Mackey, Janyth M. Wilson, Lynn Cummings, Nicole Le, Rhonda E. Carper, Kristin Peyton, Kathleen White, Jennifer Appel, Tina Pugh, Renee Kitt, Christine Gilbert, Robyn Stevenson, Richard Montgomery, Karen Gesa, Rebecca Brodkorb, Elaine Sterriberg, Dottie Chandler, Trang Anderson, Lindsey Dawson, Stacy Bauer, Arielle Masters, Kristie Tanner, Debbie Haskell, Isabel Alvarez, Maja Ruble, Judy Kiley, My-Linh Finan, Amy Miller, Dawn Walker, Catherine Studner, Karin Sadowski, RoseMarie Dorer, Paola Azucena, Kristen Byler, Ann Murray, Nicole McManamon, Kacey Houghton, Renee Moore, Beth Connell, Deborah Hoy, Melanie Bayne, Jacqueline Dobranski, Kristin Huggler, Dawn Whitlow, Donna Downing, Dan Lewis, Jean Francis, Amie Otto, Rene Brown, Martha Copeland, Lora Alston, Barbara Pond, Pamela Jo Hier, Ralf Kastenholz, Yolanda Kozma, Laura Sirko, Mary Ellen McGrath Berry, Tina Vu, Michelle Brew, Kelly Mackin, Birgit Muenz-Eden, Oriana Landt, Pauline Burkhart, Ralf Kastenholz, Yolanda Kozma, Liz Christie, Marie Ck, Johana Madrigal, Linda Poore Fanny, Natalie Kowalchuck Luna Lavrencic, J Carla Baker Zeigler, Kewalin Totab, Christine Storer, Tracey Williams, Dennis Rod, Katherine Smith, Hazel Pederson, Beth Laurents, Guy Net, July Roberts,

23

Limarie Liera Botet, Ruth Longfield, Andrea Ashby Burke, Louise Cotulia, Maryroi Goldman, Peggy Ann Keefert, Judy Bright Ashby, Anna Monroe, Roy Waldschmidt, Mami Girke, Wayne Mourbray, Jessica Cortolini, Maria Kline, Libby Hancock, Carol Fletcher Linguanti, Christie Riddle, Angelica Maria Almeyda, Christine Holmes Spriggs Bennett, Susie Thompson Bruckschen, Raymonda Shwartz, Cheryl Cline, Julie Stevens, Teresa Flesher Faulkiner, Arielle K. Masters, Emily Kramer, Joanne Pascale White, Carol Forman, Jennifer Ryerse Jones, Israel Roman, Missy Miller Blackman, Kelly J. Elmore, Mita Alford Wilson, Luanne Ley Pavlu, Sandy Eddinger, Nicole Rehberg Carlson, Sandy Leonard, Gwen Hopkins-Sadowski, Priscilla Estes Emerson, Katie Racy Wright, Shelby Yeargin, Sue Churchwell, Ned Foster, Jeff Khalatbari, Jamie Zych, Shanna Henson Miller, Phyllis Hendrickson, Theresa Wortman, Betty Sprouli, Tina Marie Serrano, Mary Beth Mount, Kelly King, Betty Wesseler, Tina Vitug-Smalley, Michelle Monzingo, Lisamarie Dorman, Jae Caskey, Judy Smith, Doug Cole, Lynne Exley-King, Luree Echols, and Bety Ibbetson.

51. Those who read the report included Barrett's neighbors and their families, numerous people in the canine breeding, sale, adoption, services, and care business, numerous residence of Broad Run, Fauquier County, Northern Virginia, and Virginia, and countless past, present, and potential customers of Barrett.

52. In an effort to limit the commercial activity of Barrett, which competes with the commercial activity of MHF, Bogley published this report to the Fauquier County Board of Zoning Appeals. Upon information and belief, this publication was not within the scope of Bogley's authority as a humane investigator.

### Plight of Animals Surrendered by Barrett

53. Bogley and the MHF subsequently began advertising for the "adoption" of the dogs relinquished by Barrett, including in the Middleburg Eccentric for February 21, 2013 stating that the dogs were "rescued from a puppy mill situation" and "came from a puppy mill," and http://www.petfinder.com/petdetail/25279319 stating that the dog and "came from a high volume breeder."

54. Bogley and the MHF have transferred at least five on the animals relinquished to MHF for the purposes of adoption by MHF to the Mid-Atlantic Great Dane Rescue League, informing this organization that the dogs were surrendered by Barrett.

### Acknowledgement of Damages by MHF

55. The results of the foregoing conduct and Bogley's and MHF's business motives were detailed in part by MHF in an email by Kim Zimmerman, the Office/Shelter Manager for MHF, on February 8, 2013, as follows with emphasis added:

"Please pass along to anyone you know, as **there are many false stories circulating about Canis Maximum Kennels:** None of the dogs belonging to Irina Barrett were confiscated. Our facility received a total of 12 dogs from Ms. Barrett, of which only one dog is a Doberman. These 12 dogs were willfully released to our facility by Ms. Barrett. The Board of Zoning Appeals will be making a decision at the next regular meeting scheduled for the first Thursday in March as to whether or not Ms. Barrett will be granted a zoning variance making it legal for her to have X amount of dogs to operate her breeding program. So, yes she is operating illegally and there is nothing the humane investigator or animal control can do to take the remaining dogs from her unless their lives are in imminent danger. **I would assume based on all the opposition the Board heard today and the over 400 emails they still have to read as a result of this hearing, there is no way she will be granted a permit to run a kennel.** With that said, **Ms. Barrett would have a certain period of time to place the dogs and I would also assume that she will probably sell them at a reduced cost to place them quickly or give them to friends or family. We will still offer to take and care for any and all dogs she needs to place,** but my thought is she probably would not be interested in receiving our help. Hope that is not the case."

25

## Intent

56. The conduct of Bogley and MHF described in this complaint was intentional, with full knowledge of the relevant facts, with reckless disregard for the truth or falsity of the statements made, with full knowledge of the circumstances and likely consequences of the acts, done with actual malice, and not in good faith.

## Negligence

57. Alternatively with the preceding paragraph, the conduct of Bogley and MHF was negligent, as they failed to act as reasonably prudent persons.

## Outrageousness

58. These conduct of Bogley and MHF described in this complaint is outrageous, shocking to the community, reckless, willful and wanton, oppressive, and with such malice as to evince a spirit of malice or criminal indifference to civil obligations, against the legitimate rights of Barrett and with conscious disregard of his rights, and are done with gross negligence, and with knowledge or consciousness that injury would result from the acts complained of.

## Damages

59. As a direct and proximate result of the conduct of Bogley and/or MHF, described in this complaint, Barrett has suffered irreparable damage to her business, her business relationships, her business interests, her business and personal reputation.

60. As a direct and proximate result of the conduct of Bogley and/or MHF, described in this complaint, Barrett has suffered economic damages including but not limited to the lost profits, loss of valuable property and property rights in her dogs, loss of business good will, costs and expenses, and attorneys' fees.

61. As a direct and proximate result of the conduct of Bogley and/or MHF, described in this complaint, Barrett has suffered great emotional damages and mental distress, humiliation, embarrassment, mental anguish, and diminution in the community.

62. As a direct and proximate result of the conduct of Bogley and/or MHF, described in this complaint, Barrett has sustained economic losses, including the loss of sales, refunding past sales, and surrendering the valuable property rights in other dogs, in order to try to mitigate the damages done by Bogley and/or MHF.

63. As a direct and proximate result of the conduct of Bogley and/or MHF, described in this complaint, Barrett has and will suffer lost profits.

## COUNT I
## VIOLATION OF 15 U.S.C. § 1125(a)(1)(A)
### (Against both defendants jointly and severally)

64. Paragraphs 1 to 63 are hereby incorporated.

65. MHF and Bogley in her capacity as an agent/employee of MHF, in connection with the dogs Barrett surrendered to MHF, have used in commerce words, terms, names, and combinations thereof, or false designations as to the origins of such dogs, false or misleading description of facts, or false or misleading representation of facts that is likely to cause confusion, or to cause mistake, or to deceive as to the origin of the dogs by another person.

66. For instance, MHF and Bogley have erroneously described both in Bogley's report and in the advertising published by MHF based on Bogley's report the medical conditions of the dogs Barrett surrendered, the environmental conditions in which the dogs lived, the facilities within which they were born, and Barrett who was their prior owner.

67. Barrett is likely to and has been damaged in her business and reputation by this conduct.

27

## COUNT II
## VIOLATION OF 15 U.S.C. § 1125(a)(1)(B)
### (Against both defendants jointly and severally)

68. Paragraphs 1 to 63 are hereby incorporated.

69. MHF and Bogley in her capacity as an agent/employee of MHF, in connection with the

    dogs Barrett surrendered to MHF, have used in commercial advertising or promotion

    words, terms, names, and combinations thereof, or false designations as to the origins of

    such dogs, false or misleading description of facts, or false or misleading representation

    of facts, misrepresents the nature, characteristics, qualities, or geographic origin of the

    dogs.

70. For instance, MHF and Bogley have erroneously described the dogs Barrett has

    surrendered as "rescued from a puppy mill situation" and "came from a puppy mill."

71. Barrett is likely to and has been damaged in her business and reputation by this conduct.

## COUNT III
## VIOLATION OF VA. CODE § 18.2-499(a) and -500
### (Against both defendants jointly and severally)

72. Paragraphs 1 to 63, except 57, are hereby incorporated.

73. Upon information and belief, Bogley, MHF, and others combined, associated, mutually

    undertook, and concerted together for the purposes of willfully, intentionally,

    purposefully, and without lawful justification injuring Barrett in her reputation, trade, and

    business.

74. Upon information and belief, this conspiracy includes but is not limited to:

    a.   Bogley in her capacity as a human investigator for Fauquier County combining

         and associating with MHF for the purpose of inducing Barrett to surrender

animals and for the purpose of using Bogley's joint agency to the detriment of Barrett's business by the publication of Bogley's report

b. Bogley and MHF concerting with Fauquier County and/or Fauquier County Animal Contol and its officers, agents and employees to induce Barrett to surrender the dogs to MHF and for the publication of Bogley's report.

c. Bogley and MHF concerting with the Fauquier County Zoning Board of Appeals for the publication of Bogley's report.

d. Bogley and MHF concerting with Middleburg Eccentric and http://www.petfinder.com/ for the purpose of purpose of publishing advertisements damaging to Barrett.

e. Bogley and MHF associating with Mid-Atlantic Great Dane Rescue League for the purposes of distributing the animals Bogley and MHF induced Barrett to surrender.

75. Upon information and belief, the conspiracy described in this count was motivated by Bogley's and MHF's desire to harm Barrett and her business as a business competitor of MHF; a desire to generate favorable publicity for Bogley and MHF; and a desire for direct fiscal gain through the acquisition of Barrett's animals and indirect fiscal gain through donations, grants, and promotional stories arising from their conduct.

76. This conspiracy caused Barrett business damages, including damage to business reputation, good will, and lost profits.

## COUNT IV
## VIOLATION OF VA. CODE § 18.2-499(b) and -500
### (Against both defendants jointly and severally)

77. Paragraphs 1 to 63, except 57, are hereby incorporated.

78. Upon information and belief, Bogley and/or MHF attempted to procure the participation cooperation, agreement, or assistance of others to enter into a combination, association, agreement, mutual understanding or concert for the purposes of willfully, intentionally, purposefully, and without lawful justification injuring Barrett in her reputation, trade, and business.

79. Upon information and belief, the overt actions of this attempted conspiracy includes but are not limited to:

   a. The publication of Bogley's purposefully sensation report directed toward inducing the readers to share the story orally or in writing with others.

   b. The publication by Bogley and/or MHF of allegations similar to those contained in the report to Mid-Atlantic Great Dane Rescue League for the purpose of inducing Mid-Atlantic Great Dane Rescue League to share the allegations orally or in writing with others

   c. Upon information and belief, the promotion of the report published by Bogley for the purpose of inducing the readers to share the story orally or in writing with others.

80. Upon information and belief, the desired conspiracy described in this count was motivated by Bogley's and MHF's desire to harm Barrett and her business, as a business competitor of MHF; a desire to generate favorable publicity for Bogley and MHF; and a desire for direct fiscal gain through the acquisition of Barrett's animals and indirect fiscal gain through donations, grants, and promotional stories.

81. This false representations made in conjunction with this attempted conspiracy caused Barrett business damages, including damage to business reputation, good will, and lost profits.

## COUNT V
## DEFAMATION – PUBLICATION OF BOGLEY'S REPORT
## INTENTIONAL CONDUCT
**(Against both defendants jointly and severally)**

82. Paragraphs 1 to 63, except 57, are hereby incorporated.

83. Bogley published her report with its factually false allegations, insinuations, and implications of and concerning Barrett, to third parties, causing Barrett damages.

84. Bogley's report is defamatory per se, as it implies that Barrett is unfit for her profession or trade and otherwise prejudices Barrett in her profession and trade.

85. Bogley's report and the foreseeable republication of her report has and will proximately cause Barrett damages, including damages to her reputation, damages to her business, and mental and emotional distress.

86. The report, the circumstances and extent of its publication, and Bogley's knowledge of the falsity contained therein and malice against Barrett negates any claim of privilege.

87. Upon information and belief, MHF is liable for the publication of this report under the doctrine of respondeat superior, as Bogley published this report as an agent of MHF and in the pursuit of MHF's interests.

## COUNT VI
## DEFAMATION – PUBLICATION OF BOGLEY'S REPORT
## NEGLIGENT CONDUCT
**(Against both defendants jointly and severally)**

88. Paragraphs 1 to 63, except 56, are hereby incorporated.

89. Bogley published her report with its factually false allegations, insinuations, and implications of and concerning Barrett, to third parties, causing Barrett damages.

90. Bogley's report is defamatory per se, as it implies that Barrett is unfit for her profession or trade and otherwise prejudices Barrett in her profession and trade.

91. Bogley's report and the foreseeable republication of her report has and will proximately cause Barrett damages, including damages to her reputation, damages to her business, and mental and emotional distress.

92. The report, the circumstances and extent of its publication, and Bogley's knowledge of the falsity contained therein and malice against Barrett negates any claim of privilege.

93. Upon information and belief, MHF is liable for the publication of this report under the doctrine of respondeat superior, as Bogley published this report as an agent of MHF and in the pursuit of MHF's interests.

## COUNT VII
## DEFAMATION – PUBLICATION IN MIDDLEBURG ECCENTRIC
## INTENTIONAL CONDUCT
### (Against both defendants jointly and severally)

94. Paragraphs 1 to 63, except 57, are hereby incorporated.

95. Upon information and belief, based on information provided by Bogley and with Bogley's consent as President of MHF, MHF published advertisements the Middleburg Eccentric falsely describing Barrett's residence as a "puppy mill," her business operations as "a puppy mill situation," and the voluntary surrender of the animals by Barrett as a "rescue" of the dogs by Bogley or MHF.

96. This advertisement is defamatory per se, as it implies that Barrett is unfit for her profession or trade and otherwise prejudices Barrett in her profession and trade.

97. This advertisement and the foreseeable republication of her report has and will proximately cause Barrett damages, including damages to her reputation, damages to her business, and mental and emotional distress.

## COUNT VIII
## DEFAMATION – PUBLICATION IN MIDDLEBURG ECCENTRIC
## NEGLIGENT CONDUCT
### (Against both defendants jointly and severally)

98. Paragraphs 1 to 63, except 56, are hereby incorporated.

99. Upon information and belief, based on information provided by Bogley and with Bogley's consent as President of MHF, MHF published advertisements the Middleburg Eccentric falsely describing Barrett's residence as a "puppy mill" and her business operations as "a puppy mill situation."

100. This advertisement is defamatory per se, as it implies that Barrett is unfit for her profession or trade and otherwise prejudices Barrett in her profession and trade.

101. This advertisement and the foreseeable republication of her report has and will proximately cause Barrett damages, including damages to her reputation, damages to her business, and mental and emotional distress.

102. This advertisement is defamatory per se, as it implies that Barrett is unfit for her profession or trade and otherwise prejudices Barrett in her profession and trade.

103. This advertisement and the foreseeable republication of her report has and will proximately cause Barrett damages, including damages to her reputation, damages to her business, and mental and emotional distress.

## COUNT IX
## ACTUAL FRAUD
### (Against both defendants jointly and severally)

104. Paragraphs 1 to 63, except 57 are hereby incorporated.

105.     Bogley and MHF made several (1) false representations, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) with reliance by the party misled, and (6) resulting damage to the party misled, for which plaintiff is entitled to recover for actual fraud under Virginia law.

106.     Bogley and MHF made a series of misrepresentations to Barrett inducing Barrett to surrender dogs to MHF for the purposes of MHF placing them with owners and generating revenue directly and indirectly through such conduct. The misrepresentations by Bogley and MHF include:

   a.  Bogley represented that MHF would attempt to place the animals with individuals or families, and to care for the animals unless or until they are so placed;

   b.  Bogley represented that Bogley and MHF would not disclose to third parties that Barrett surrendered dogs to MHF;

   c.  Bogley represented that Bogley and MHF would not take any action, except what was required by law, that would reasonably cause Barrett's surrendering of the dogs to MHF to cause Barrett's business any harm.

   d.  Bogley represented that Bogley would assist Barrett in implementing the improvements to the business operations that Bogley thought were necessary.

107.     These misrepresentations of present intent by MHF and Bogley were intentionally and knowingly made misrepresenting material facts with the intent to mislead, which misrepresentations were reasonably relied upon by Barrett and induced Barrett to act causing Barrett the damages described in this complaint.

108.     Additional material misrepresentations included inter alia:

a.  Upon information and belief, Bogley's representations to Barrett on the January 12 that she was responding to an anonymous complaint about Barrett's facilities.

b.  Upon information and belief, Bogley's representations to Barrett on the January 12 concerning the inadequacy of Barrett's facilities and practices and the need for improvements, as described above.

c.  Upon information and belief, Bogley's representations to Barrett on the January 12 that Barrett had too many dogs at the residence.

d.  Upon information and belief, Bogley's representations to Barrett on January 17 concerning the condition of the dogs surrendered by Barrett to MHF on January 12.

e.  Upon information and belief, Bogley's representations to Barrett on or about the January 12, 17, and 30 that MHF would attempt to place the animals Barrett surrendered with individuals or families, and to care for the animals unless or until they are so placed.

f.  Upon information and belief, Bogley's representations to Barrett on or about the January 12, 17, and 30 that Bogley and MHF not to disclose to third parties that Barrett surrendered dogs to MHF.

g.  Upon information and belief, Bogley's representations to Barrett on or about the January 12, 17, and 30 that Bogley and MHF not to take any action, except what was required by law, that would reasonably cause Barrett's surrendering of the dogs to MHF to cause Barrett's business any harm.

h. Upon information and belief, Bogley's representations to Barrett on or about the January 12, 17, and 30 that Bogley to assist Barrett in implementing the improvements to the business operations that Bogley thought were necessary.

109.     Additionally, Bogley, who was improperly using her position as a court-appointed humane investigator for the benefit of herself and of MHF, and MHF knowingly and deliberately did not disclose material facts that they knew were unknown to Barrett, for the purposes of defrauding Barrett. The disclosure of the facts would have caused Barrett not to take the actions she did, and the nondisclosure caused Barrett the damages described in this complaint. These nondisclosures included inter alia:

a. The failure to disclose that Bogley, who entered the premises under the color of law as a humane investigator and used her apparent authority to criticize Barrett's practices, was also a paid agent/employee of MHF, who would receive Barrett's dogs.

b. The failure to disclose that MHF actually charges for the "adoptions," thereby converting them into sales.

c. The failure to disclose that Bogley intended to submit a report to the Zoning Board about the visits.

d. The failure to disclose that MHF could not itself then care for the number of dogs Barrett was surrendering to them, and would have to deliver some of the dogs to another organization for placement.

e. The failure to disclose that MHF intended to advertise these dogs as being "rescued" from a "puppy mill."

110.     The Fraud of Bogley and MHF has and will has and will proximately cause

Barrett damages, including damages to her reputation, damages to her business, and

mental and emotional distress.

### COUNT X
### VIOLATION OF VIRGINIA CODE § 59.1-200
**(Against both defendants jointly and severally)**

111.     Paragraphs 1 to 63 are hereby incorporated.

112.     MHF and Bogley in her capacity as an agent/employee of MHF, in connection

with the dogs Barrett surrendered to MHF, have misrepresented the source of goods in

advertisements for consumer transactions

113.     For instance, MHF and Bogley have erroneously described the dogs Barrett has

surrendered as "rescued from a puppy mill situation" and "came from a puppy mill."

114.     Barrett is likely to and has been damaged in her business and reputation by this

conduct.

### COUNT XI
### VIOLATION OF VIRGINIA CODE § 59.1-200
**(Against both defendants jointly and severally)**

115.     Paragraphs 1 to 63 are hereby incorporated.

116.     Bogley in her capacity as an agent/employee of MHF, used deception, fraud, false

pretense, false promise, or misrepresentation in connection with a consumer transaction.

117.     Namely, Bogley deceived and defrauded Barrett with regard to the need or

desirability to surrender Barrett's animals to MHF for the purposes of placing them with

families, and in the other ways described above.

118.     Bogley used false pretenses, namely the representation of her authority or apparent authority and the other conduct described above to induce Barrett to surrender her animals to MHF for the purposes of placing them with families.

119.     Bogley used false promises and misrepresentations, as described above, to induce Barrett to surrender her animals to MHF for the purposes of placing them with families.

120.     Barrett is likely to and has been damaged in her business and reputation by this conduct.

## AD DAMNUM

**WHEREFORE** on the claims of the plaintiff, Barrett demands judgment against Bogly and MHF jointly and severally as follows:

1)  in the amount of $1,000,000 in compensatory damages,

2)  plus actual or statutory damages for lost profit on Counts I and II,

3)  with damages as to Counts III and IV trebled per Virginia Code § 18.2-500,

4)  with damages as to Counts X and XI trebled per Virginia Code § 59.1-204

5)  plus $350,000 in punitive damages on Counts I to II and V to X,

6)  plus costs and attorneys' fees pursuant to 17 USCS § 505,[3] and Virginia Code § 18.2-500 and § 59.1-204,

7)  plus pre- and post-judgment interest,

8)  and all such further and additional relief as may be appropriate.

**TRIAL BY JURY REQUESTED.**

---

[3] § 505. Remedies for infringement: Costs and attorney's fees

In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

Respectfully requested,
**IRINA BARRETT**

By: _/s/ Andrew T. Bodoh_
Counsel

Thomas H. Roberts, Esq. (VSB 26014)
tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. (VSB 80143)
andrew.bodoh@robertslaw.org
**THOMAS H. ROBERTS & ASSOCIATES, P.C.**
105 South 1st Street
Richmond, Virginia 23219
Tel: 804-783-2000
Fax: 804-783-21058
*Counsel for Plaintiff*